RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MELISSA MAYS; MICHAEL MAYS; JACQUELINE PEMBERTON; KEITH JOHN PEMBERTON; ELNORA CARTHAN; RHONDA KELSO,

        *Plaintiffs-Appellees,*

    *v.*

CITY OF FLINT, MICH., et al.,

        *Defendants,*

PATRICK COOK; ADAM ROSENTHAL; MICHAEL PRYSBY; STEPHEN BUSCH; LIANE SHEKTER SMITH; BRADLEY WURFEL,

        *Defendants-Appellants.*

No. 16-2484

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:16-cv-11519—John Corbett O'Meara, District Judge.

Argued: August 2, 2017

Decided and Filed: September 11, 2017

Before: SUHRHEINRICH, GILMAN, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Charles E. Barbieri, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, for Appellants. William H. Goodman, GOODMAN & HURWITZ, P.C., Detroit, Michigan, for Appellees. **ON BRIEF:** Charles E. Barbieri, Allison M. Collins, FOSTER, SWIFT, COLLINS & SMITH, P.C., Lansing, Michigan, Thaddeus E. Morgan, FRASER, TREBILCOCK, DAVIS & DUNLAP, Lansing, Michigan, Jay M. Berger, Michael J. Pattwell, CLARK HILL PLC, Lansing, Michigan, Philip A. Grashoff, Jr., KOTZ SANGSTER WYSOCKI, P.C., Bloomfield Hills, Michigan, for Appellants. Beth M. Rivers, Michael L. Pitt,

Cary S. McGehee, PITT MCGEHEE PALMER & RIVERS, PC, Royal Oak, Michigan, for Appellees.

GILMAN, J., delivered the opinion of the court in which SUHRHEINRICH, J., joined. McKEAGUE, J. (pp. 18–24), delivered a separate dissenting opinion.

―――――――――――

**OPINION**

―――――――――――

RONALD LEE GILMAN, Circuit Judge.  This case arises out of the drinking-water crisis in Flint, Michigan.  The Plaintiffs are residents of the City of Flint who represent themselves and seek to represent a class of similarly situated individuals.  They allege that they have been harmed since April 2014 by the toxic condition of the Flint water supply.  The Plaintiffs filed suit against several City and State officials in the Genesee County Circuit Court, asserting various state-law tort claims.

Complete diversity of citizenship is lacking, and no federal question is presented on the face of the complaint.  Nevertheless, four of the State officials who are present or former employees of the Michigan Department of Environmental Quality (the MDEQ Defendants) removed the action from the state court to federal court on two grounds.  They first invoked the "federal-officer removal" provision under 28 U.S.C. § 1442(a)(1), contending that all of their conduct in question was performed under the supervision and direction of the United States Environmental Protection Agency (the EPA).  Second, the MDEQ Defendants contend that the Plaintiffs' claims necessarily implicate a substantial federal issue that merits federal-question jurisdiction under 28 U.S.C. § 1441.

The Plaintiffs objected to removal.  They filed a motion seeking to have the district court remand the case back to the state court, which the district court granted.  On appeal, the MDEQ Defendants ask us to reverse the remand order.  For the reasons set forth below, we instead **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

A.      **Factual background**

Prior to April 2014, Flint had obtained its drinking water under contract with the City of Detroit.  That month Flint switched its source of drinking water to the Flint River in order to save money.

In January 2016, several of the Plaintiffs filed a class-action lawsuit in the Genesee County Circuit Court. The complaint alleged state-law claims of gross negligence, fraud, assault and battery, and intentional infliction of emotional distress.  According to the complaint, the MDEQ Defendants committed these tortious actions by allowing Flint to switch its water supply without using an anti-corrosive agent, despite knowledge that the water was "highly corrosive and unsafe."  This knowledge allegedly came from a 2011 report commissioned by the City of Flint, which concluded that the Flint River water could not be safely used for drinking unless it was treated with an anti-corrosive agent.  Such an agent would be necessary to prevent lead and other chemicals from leaching into the water.  The MDEQ received a copy of this report in 2013.  But the MDEQ Defendants nevertheless allegedly failed to introduce corrosion-control treatments in a timely manner.

Just days after the switch in the water supply, the Plaintiffs allege that the City of Flint began receiving complaints "that the water was cloudy and discolored in appearance and foul in taste and odor."  Water users also began reporting physical symptoms that included hair loss, rashes, and vomiting within weeks of the switch. Similar complaints were continually made to both the City of Flint and MDEQ officials for the next eight months.  Numerous children in Flint were found to have elevated blood-lead levels by late 2014, and the MDEQ Defendants allegedly knew of this problem by early 2015.  But the MDEQ Defendants, according to the Plaintiffs, did not reveal this problem to the public until after an August 2015 report was publicly disclosed.

The complaint further contends that the MDEQ Defendants deliberately ignored evidence that the water was unsafe and "falsely reassure[d] [the public] and insist[ed] that the water was safe even though they knew that the foul taste, odor and appearance was attributable to the highly corrosive Flint River water, untreated with the proper anti-corrosive agents."  It also

alleges, among other things, that the MDEQ Defendants refused an opportunity to reconnect with Detroit's safe drinking-water supply, falsely told the EPA in February 2015 that the Flint River water was receiving corrosion-control treatments, failed to maintain proper records needed to identify which water users had lead pipes, and failed to carry out proper water-quality tests.

In October 2015, the Governor of Michigan ordered Flint to reconnect with the Detroit water system. The Plaintiffs allege that, even after the reconnection, the MDEQ Defendants were grossly negligent in failing to properly monitor water quality and to protect residents from exposure when they knew that the water remained unsafe.

**B.      Procedural background**

In April 2016, the MDEQ Defendants filed a notice of removal in the United States District Court for the Eastern District of Michigan. The MDEQ Defendants sought removal under two statutory provisions: (1) 28 U.S.C. § 1442, the federal-officer removal statute, and (2) 28 U.S.C. § 1441, which allows removal for state-law causes of action that raise substantial federal questions.

According to the notice of removal, federal-officer removal is appropriate because the MDEQ Defendants are being sued for actions that they took while acting under the direction of the EPA. The MDEQ Defendants assert that they were acting under the EPA because the EPA delegated primary enforcement authority to the MDEQ to implement the federal Safe Drinking Water Act (SDWA) in Michigan. Among the SDWA's requirements is the submission to the EPA of quarterly and annual reports detailing the MDEQ's compliance with the EPA's Lead and Copper Rule (LCR). *See* 40 C.F.R. § 142.15. Under this primary enforcement scheme, the MDEQ Defendants contend that the EPA retains "tremendous oversight authority" over the MDEQ, including the ability to intervene or to withdraw primary enforcement authority in the event that the State fails to meet regulatory requirements.

The MDEQ Defendants also assert that they are being sued for actions that were "guided by repeated written and verbal dialogue with a number of EPA officers who advised and oversaw" the MDEQ's regulation of the Flint water system. According to the notice of removal, the fact that the MDEQ Defendants were "acting under" the EPA "is most clearly demonstrated

by" an emergency order that the EPA issued on January 21, 2016. The emergency order stated that the MDEQ and the City of Flint had failed to adequately respond to the drinking-water crisis, and it directed the MDEQ to take certain actions deemed necessary by the EPA. In addition, the EPA announced that it would begin conducting its own water-quality tests in the City of Flint and publishing the results on its website.

To support their alternative ground for removal, the MDEQ Defendants assert that the Plaintiffs' claims will raise a substantial federal question: whether the MDEQ Defendants complied with the SDWA and the LCR. The MDEQ Defendants argue that the applicability of the SDWA and the LCR to the present case is ambiguous and that a need for uniform interpretation of those laws is a substantial federal interest supporting removal.

In response to the MDEQ Defendants' notice of removal, the Plaintiffs filed a motion to remand the case back to the Genesee County Circuit Court. The district court granted the Plaintiffs' motion and remanded the case. This timely appeal of the remand order is authorized by 28 U.S.C. § 1447(d) because the MDEQ Defendants removed the case under 28 U.S.C. § 1442. Our jurisdiction to review the remand order also encompasses review of the district court's decision on the alternative ground for removal under 28 U.S.C. § 1441. *See Lu Johnhong v. Boeing Co.*, 792 F.3d 805, 811–13 (7th Cir. 2015).

## II. ANALYSIS

### A. Standard of review

We review de novo the district court's determination that it lacked subject-matter jurisdiction and its consequent decision to issue a remand order. *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 404 (6th Cir. 2007). As the party seeking removal, the MDEQ Defendants bear the burden of establishing federal court jurisdiction. *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006). Where, as here, the district court treats the motion to remand as a facial attack on the court's jurisdiction, we look only to the pleadings—the complaint and the notice of removal—for the relevant facts. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). This includes the consideration of exhibits attached to the pleadings "so long as they are referred to in the [pleadings] and central to

the claims contained therein." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (2008)). As this court has previously stated, removal statutes are to be strictly construed, and "all doubts should be resolved against removal." *Harnden v. Jayco, Inc.*, 496 F.3d 579, 581 (6th Cir. 2007); *see also Eastman*, 438 F.3d at 550.

**B. Removal by the MDEQ Defendants under the federal-officer removal statute was properly denied.**

The federal-officer removal statute allows removal of actions against "[t]he United States or any agency thereof or any officer *(or any person acting under that officer)* of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added). Persons like the MDEQ Defendants, who are not federal officers, must satisfy three requirements in order to invoke the federal-officer removal statute: (1) the defendants must establish that they acted under a federal officer, (2) those actions must have been performed under color of federal office, and (3) the defendants must raise a colorable federal defense. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010).

### 1. History of the federal-officer removal statute

The Supreme Court discussed the federal-officer removal statute most recently in *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007). A discussion of the history of the federal-officer removal statute begins the Court's analysis. The Court noted that Congress enacted the original federal-officer removal statute during the War of 1812. *Id.* at 147. That war was especially unpopular in New England, where many state court actions had been filed against federal customs officials whose duties included enforcing a trade embargo on England. *Id.* The Court explained that the "initial removal statute was 'obviously . . . an attempt to protect federal officers from interference by hostile state courts.'" *Id.* at 148 (quoting *Willingham v. Morgan*, 395 U.S. 402, 405 (1969)).

Originally, the federal-officer removal statute covered only federal customs officials and "any other person aiding or assisting" those officials. *Id.* (emphasis removed) (quoting Customs

Act of 1815, ch. 31, s 8, 3 Stat. 198).  Over time, Congress gradually expanded the scope of the statute, first to include persons assisting federal revenue officials, and later to include all federal officials and persons acting under them.  *Id.* at 148–49.  But as the Court noted in *Watson*, these changes simply provided that more types of federal officials could take advantage of removal, with no indication that Congress intended to expand the scope of the words "acting under."  *Id.* at 149.

Early uses of the somewhat broadened version of the federal-officer removal statute involved cases where people were killed when federal officers raided illegal distilleries.  *Id.* at 149–50.  When murder charges were brought against the federal officers in state court, the federal officers were allowed to remove the cases to federal court.  *Id.*  In one of those cases, the Supreme Court reasoned that a private person acting as a chauffeur to the federal officers "had 'the same right to the benefit of the removal provision as did the federal agents,'" even though the Court denied removal for other reasons.  *Id.* at 150 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 30 (1926)).

The *Watson* Court explained that these early cases "illustrate that the removal statute's 'basic' purpose is to protect the Federal Government from the interference with its 'operations'" that would occur if a federal officer could be tried in state court for a state offense related to the operation.  *Id.*  Concerns about "'local prejudice' against unpopular federal laws or federal officials" thus underlie the federal-officer removal statute.  *Id.*  As the Court explained, states that were antagonistic toward federal government operations might use state court proceedings to thwart the enforcement of federal law.  *Id.*

### 2.      The Supreme Court's application of the federal-officer removal statute in **Watson**

*Watson* involved a cigarette manufacturer, Philip Morris, which filed a notice of removal based on the federal-officer removal statute.  The plaintiff-smokers in *Watson* alleged that Philip Morris had engaged in deceptive business practices by using testing methods for its cigarettes that underreported the levels of tar and nicotine contained in the cigarettes.  Concluding that the complaint challenged Philip Morris's use of the federal government's method for testing cigarettes, the district court held that the federal-officer removal statute applied, and the Eighth

Circuit affirmed that decision. The Supreme Court reversed, holding that "the fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail" was not enough to establish that Philip Morris was "acting under" an officer of the federal government. *Id.* at 145.

*Watson* did not formulate a clear test for when the acting-under requirement is satisfied. But the Court set forth several considerations that are helpful in analyzing the present case. After reviewing the history of the federal-officer removal statute, as discussed above, the Court concluded that "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* at 151 (quoting 18 Oxford English Dictionary 948 (2d ed. 1989)). The acting-under relationship "typically involves 'subjection, guidance, or control.'" *Id.* (citing dictionary definitions of "under" as "subordinate or subservient to" or "subject to"). In addition, the Court explained that a private entity must be assisting the federal government in carrying out the government's own tasks in order to invoke federal-officer removal. *Id.* at 152. Simply complying with a regulation is insufficient, even if the regulatory scheme is "highly detailed" and the defendant's "activities are highly supervised and monitored." *Id.* at 153.

> **3.** **Watson** *supports the conclusion that the MDEQ Defendants were not "acting under" the EPA for purposes of the federal-officer removal statute.*

In the present case, the MDEQ Defendants emphasize that the EPA would have to enforce the SDWA in Michigan if the MDEQ did not have primary enforcement authority to do so. *Watson* indicates that this is a factor supporting removal. 551 U.S. at 153–54. If this were the only factor for us to consider, then the MDEQ Defendants might well be entitled to remove the case under the federal-officer removal statute.

But we read *Watson* as requiring more. Specifically, *Watson* interprets "acting under" to mean that the defendant seeking removal must be in a relationship with the federal government where the government is functioning as the defendant's superior. *Id.* at 151. The Court went on to explain that the federal-officer removal statute was inapplicable to the facts in *Watson* because there was "no evidence of any delegation of legal authority from the FTC to the industry

association to undertake testing on the Government agency's behalf. Nor is there evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement." *Id.* at 156.

In the present case, the MDEQ Defendants argue that they were acting under the EPA because the EPA delegated to the MDEQ primary enforcement authority over the SDWA in Michigan. The district court disagreed, concluding that there is no contract, no employer/employee relationship, nor any other indication of a principal/agent arrangement between the MDEQ and the EPA.

We acknowledge at the outset that the MDEQ does receive funds from the EPA. But we conclude that the receipt of federal funding alone cannot establish a delegation of legal authority because finding such a delegation on that basis is way beyond the reasoning of *Watson* and would allow myriad state agencies to invoke federal-officer removal.

We now turn to the question of whether the EPA's delegation to the MDEQ of primary enforcement authority warrants federal-officer removal under *Watson*. Our research has revealed no caselaw from the Supreme Court, this court, or our sister circuits addressing the issue of whether state officers working in a joint federal-state regulatory system can invoke the federal-officer removal statute. As the *Watson* Court noted, federal-officer removal has been found to be applicable to certain government contractors. *Id.* at 153–54. The Court suggested that contracts could delegate legal authority as required for federal-officer removal where a government contractor is helping to fulfill the federal government's tasks. *Id.*

We further note that a government contractor entitled to removal would presumably be contractually required to follow the federal government's specifications in making products or providing services. *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 134, 137–38 (2d Cir. 2008) (holding that a government contractor that manufactured Agent Orange for the government was entitled to federal-officer removal in a state-law tort action for injuries caused by the product, noting that the government had contractually required that the product be made to meet certain specifications). And a government contractor would not ordinarily have any authority to take

actions beyond those specified in the contract.  In these cases, the federal government can properly be viewed as acting in a superior relationship to the private entity.

The MDEQ Defendants insist that the government-contractor cases apply here.  They heavily rely on a few such district court cases to support their argument, but these cases are distinguishable.  In *Clio Convalescent Center v. Michigan Department of Consumer & Industry Services*, 66 F. Supp. 2d 875, 876 (E.D. Mich. 1999), for example, the district court allowed a state agency to invoke the federal-officer removal statute because the agency had entered into an agreement with the Secretary of Health and Human Services to ensure compliance with Medicaid's nursing-home certification requirements.  That agreement explicitly provided that the state agency would act on the Secretary's behalf.  *Id.*  The district court found that the Secretary was the real party in interest and that the state agency was acting as the Secretary's agent, evidenced in part by the fact that the Secretary moved to intervene in the case.  *Id.* at 877. A similar outcome was reached in *Thompson v. Community Insurance Co.*, No. C-3-98-323, 1999 U.S. Dist. LEXIS 21725, *12–13 (S.D. Ohio 1999), because that case involved a contractual agreement with an insurance company to act as a "fiscal intermediary" of the federal government in administering a Medicare program.

In the present case, there is no comparable contract or other delegation of legal authority to the MDEQ to act as the EPA's agent or on the EPA's behalf.  Furthermore, this court has recently indicated, albeit in an unpublished opinion, that the absence of language allowing a private entity to act on the federal government's behalf weighs against allowing federal-officer removal.  *See Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 623–24 (6th Cir. 2016) (explaining that a Medicare Advantage Organization could *not* invoke the federal-officer removal statute because the relevant regulations did not permit the organization to act on the federal government's behalf, the organization had the freedom to use some innovative private-market techniques, the government was not controlling the entity's daily operations, and the government would not have to perform the exact same tasks as the organization in the absence of the contractual arrangement).

Another case relied on by the MDEQ Defendants is *City of St. Louis v. Velsicol Chemical Corp.*, 708 F. Supp. 2d 632 (E.D. Mich. 2010).  In that case, the district court allowed federal-

officer removal by a defendant trust that had been created pursuant to a settlement under a federal environmental statute. *Id.* at 661–62. The trust's objective was to resolve claims for cleanup costs and to manage the money allocated for the cleanup. *Id.* at 644–47. As in *Clio*, the federal government intervened in the action, arguing that removal was proper on the basis of the EPA's control of the trusts. *Id.* at 661–62, 667–68. We conclude that *Velsicol* is distinguishable from the present case because it involved a trust—a relationship that required the defendant trustee to act "solely in a fiduciary capacity consistent with, and in furtherance of, the purposes" of the trust and the settlement agreements. *Id.* at 647 (quoting trust agreements). As previously explained, there is no comparable legal relationship here.

Instead, in order for the MDEQ to obtain primary enforcement authority, the state of Michigan chose to enact its own state safe-drinking-water laws. *See* 42 U.S.C. § 300g-2(a)(1) (providing that a state can obtain primary enforcement responsibility if, among other things, it "has adopted drinking water regulations that are no less stringent than the national primary drinking water regulations"). Although Michigan's laws had to comply with the standards set forth in the SDWA and its accompanying regulations in order for the MDEQ to obtain primary enforcement authority, Michigan was free to enact more stringent requirements for the protection of its residents. *See id.* That Michigan decided to enact a regulatory scheme that essentially mirrors the federal one does not mean that Michigan was required to do so.

Once the MDEQ received primary enforcement authority, it had to periodically submit reports to the EPA detailing compliance with regulations that had been adopted into state law. *See* 40 C.F.R. § 142.15. The MDEQ points to these reports as evidence of the EPA's control over it, but *Watson* indicates that compliance reporting, even if detailed, is insufficient by itself to merit federal-officer removal. *See Watson*, 551 U.S. at 156.

Similarly, the MDEQ Defendants vaguely allege that they were guided by "repeated written and verbal dialogue" with the EPA in taking the actions (and inactions) that are challenged in this case. We note, however, that counsel for the MDEQ Defendants conceded at oral argument that the EPA was not involved in the key action underlying the Plaintiff's complaint—approval of the decision to switch Flint's water supply to the Flint River. And the notice of removal does not identify any specific actions or inactions alleged in the complaint that

the EPA required the MDEQ Defendants to take or refrain from taking. Nor do the MDEQ Defendants explain how the SDWA required any of their actions or inactions, and they fail to identify any specific EPA officials who allegedly directed their conduct.

The MDEQ Defendants cite several communications with the EPA in their brief. But because the MDEQ Defendants did not cite these exhibits in the notice of removal, the communications are not among the pleadings that we can review on an appeal of the district court's determination that it facially lacked jurisdiction. *See Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012) ("When deciding a motion to remand, . . . [t]he court may look to material outside the pleadings for the limited purpose of determining whether there are 'undisputed facts that negate the claim'" (quoting *Walker v. Philip Morris USA, Inc.*, 443 F. App'x 946, 955–56 (6th Cir. 2011))). And even if we could review these communications, they simply suggest that the EPA and the MDEQ discussed issues related to the Flint water crisis, but not that the EPA ordered the MDEQ to take any specific action.

We also find telling the MDEQ Defendants' statement in their notice of removal that the clearest indicator that they were acting under the EPA is the emergency order issued on January 21, 2016. That order, however, was issued two days *after* January 19, 2016, the date on which the Plaintiffs filed their complaint. So any actions that the MDEQ Defendants took pursuant to that order were obviously unrelated to the actions that the Plaintiffs challenge.

True enough, the EPA retains the ability to intervene when a state with primary enforcement authority fails to meet the requirements to maintain such authority. *See* 40 C.F.R. § 142.17(a)(2). But we disagree with the MDEQ Defendants' argument that this ability to intervene supports their invocation of federal-officer removal. The fact that the EPA can intervene if a state fails to properly exercise its primary enforcement authority suggests that, absent any such failure by the state, the state retains the freedom to enforce its own safe-drinking-water laws and regulations. Michigan was so governing itself when the alleged actions and inactions giving rise to the Plaintiffs' claims occurred.

**4.      *Allowing the MDEQ Defendants to invoke the federal-officer removal statute would not serve the purpose of the statute.***

According to the MDEQ Defendants, the MDEQ and the EPA are working together in a "joint Federal-State system" that purportedly supports federal-officer removal. But a joint federal-state system suggests to us that the MDEQ was working alongside the EPA, not under it.

We agree with the Plaintiffs that the MDEQ-EPA relationship is a model of cooperative federalism, not an agency relationship. *See* Philip J. Weiser, *Towards a Constitutional Architecture for Cooperative Federalism*, 79 N.C. L. Rev. 663, 671 (2001) (discussing the popularity of cooperative federalism, of which the environmental regulations of the 1960s and 1970s are a notable example, and explaining that "the real authority under such regimes often rest with the states which ultimately exercise considerable discretion," even if the federal government sets forth the regulatory standards). The facts that the MDEQ Defendants allege in their notice of removal—such as the communications with the EPA and the MDEQ's attempts to follow guidance documents issued by the EPA—suggest that a joint relationship exists, not that the MDEQ is controlled by the EPA.

We are also persuaded by the Plaintiffs' argument that allowing removal in this case would "stand cooperative federalism on its head." Our research has not found any caselaw from the Supreme Court or our sister circuits allowing officers of a state agency to invoke the federal-officer removal statute. If the MDEQ Defendants were given the benefit of that statute, then the benefit could be extended to many other state and municipal employees whose agencies work with federal agencies or receive federal funding. This would likely open a floodgate of federal litigation of state-law tort claims based on actions undertaken by state officers.

Where, as here, a state agency is sued based on state-law tort claims for actions taken while enforcing the State's own statutes and regulations, we see no need for federal-officer removal. As discussed above, the purpose of the federal-officer removal statute is to protect federal officers from hostility toward the federal government or the enforcement of federal laws. The MDEQ Defendants might have been guided by the SDWA and its accompanying regulations in the present case, but they were ultimately enforcing *Michigan* law, which was designed to mirror federal regulations.

More importantly, any bias that the MDEQ Defendants will face in state court differs from the historic biases that the federal-officer removal statute was designed to protect against. Unlike prior cases involving local resentment of the customs laws during the War of 1812 or of the actions of federal prohibition officers, this is not a case where a state court has any reason to be hostile to the federal safe-drinking-water laws. We acknowledge that the MDEQ Defendants are likely to be unpopular figures in Genesee County. But any bias that the MDEQ Defendants might face in state court would almost certainly come from the perception that their actions and inactions created the Flint water crisis by failing to guarantee that the Flint River water was safe to drink. We do not see how the MDEQ's relationship with the EPA or the relationship between Michigan's safe-drinking-water laws and the SDWA could be viewed as a source of bias.

Finally, we acknowledge the *Watson* Court's statement that "[t]he words 'acting under' are broad." *Watson*, 551 U.S. at 147. But the Court also went on to explain that "[b]road language is not limitless. And a liberal construction can nonetheless find limits in a text's language, context, history, and purposes." *Id.* The Court then explained that the history of the federal-officer removal statute indicated that its purpose is to protect federal officers from state court hostility to the federal government, as discussed above. *Id*. at 148.

All three of the cases cited by *Watson* for the point that the statute's scope is broad involve situations where the undisputed facts showed that the defendant was a federal officer or an employee of a federal officer. In *Arizona v. Manypenny*, 451 U.S. 232, 234–36 (1981), for example, the defendant was a border-patrol agent employed by the Immigration and Naturalization Service who was indicted in state court for assault with a deadly weapon after shooting a man fleeing toward the border after the defendant told him to stop. There was no dispute that the defendant had satisfied the acting-under requirement. *See id.* at 236. The Court noted that the statute was to be construed broadly in the context of discussing the fact that Arizona law would be applied in the federal proceeding. *Id.* at 242.

Similarly, in *Willingham v. Morgan*, 395 U.S. 402, 403 (1969), the defendants were federal-prison employees who were sued under state tort law. The court remarked on the federal-officer removal statute's broad scope in the context of concluding that its "color of office" language covered acts taken while the defendants were allegedly "on a frolic of their

own" instead of being engaged in official duties. *Id.* at 404–10 (quoting motion for remand). And *Colorado v. Symes*, 286 U.S. 510, 514–16 (1932), involved the classic case of a prohibition agent who faced a murder prosecution in state court, which arose out of an encounter with a suspect who was openly drinking wine at a restaurant. Removal in these cases thus clearly served the historical purpose of the federal-officer removal statute. The present case is markedly different because the MDEQ Defendants are state officers who have been sued for actions and inactions related to their enforcement of state law.

We therefore conclude that the MDEQ Defendants were not "acting under" the EPA and thus are not eligible for federal-officer removal. Because we conclude that the acting-under requirement is not satisfied, we need not decide whether the MDEQ Defendants are being sued for actions taken under color of federal law or whether the MDEQ Defendants have raised a colorable federal defense.

**C.** **This case does not present a substantial federal question that merits removal under 28 U.S.C. § 1441.**

The MDEQ Defendants argue in the alternative that they are entitled to removal under 28 U.S.C. § 1441. Removal pursuant to § 1441 is proper where a state-law claim involves a federal issue that is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress," "which a federal forum may entertain without disturbing a congressionally approved balance of federal and state judicial responsibilities." *Gunn v. Minton*, 568 U.S. 251, 258 (2013). As the Supreme Court has cautioned, however, removal based on the theory that a state-law claim raises a substantial federal question is appropriate only in "a special and small category of cases." *Id.*

In the present case, the Plaintiffs have alleged state-law claims of gross negligence, fraud, assault and battery, and intentional infliction of emotional distress. The MDEQ Defendants argue that this case nevertheless meets all of the requirements for removal under 28 U.S.C. § 1441 because the complaint alleges that the MDEQ Defendants breached duties to the Plaintiffs that were based on the SDWA and the LCR. According to the MDEQ Defendants, the interpretation of the LCR is "inherently tied to" the determination of whether the MDEQ Defendants were negligent. They contend that there is a sufficient federal interest to merit

removal because of the need to avoid inconsistent interpretations of the LCR. The Plaintiffs counter that the district court correctly concluded that this case does not raise a substantial federal issue.

We agree with the Plaintiffs and the district court. As the removing party, the MDEQ Defendants bear the burden of demonstrating that a basis for federal jurisdiction exists. The MDEQ Defendants have vaguely alleged that the Plaintiffs' gross-negligence claims are inextricably related to the interpretation of the LCR because those regulations are "ambiguous and susceptible to multiple interpretations as applied to Flint."

But the Supreme Court has held that, when a plaintiff's complaint raises garden-variety tort claims, "the presence of a claimed violation of [a federal] statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 814 (1986) (concluding that a negligence per se claim based on alleged violations of a federal statute did not warrant federal jurisdiction); *see also Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318–19 (2005) (reaffirming that *Merrell Dow*'s reasoning applies in cases presenting garden-variety tort claims, but allowing removal on the basis that the issue before the Court in *Grable* was a relatively rare state quiet-title claim based directly on the effect of an IRS notice of seizure to satisfy a federal tax lien). Both *Grable* and *Merrell Dow* noted that allowing federal jurisdiction over typical negligence claims that implicated issues of federal law could dramatically increase the volume of federal litigation over state-law claims. *See Merrell Dow*, 478 U.S. at 811–12; *Grable*, 545 U.S. at 319. This court applied the holding of *Merrell Dow* post *Grable* in 2012, reiterating that state-law negligence claims arising out of violations of a federal statute do not merit federal jurisdiction. *See Hampton v. R.J. Corman R.R. Switching Co.*, 683 F.3d 708, 712–13 (6th Cir. 2012).

Furthermore, where Congress has not created a private cause of action for violations of a federal statute, there is less likely to be a substantial interest in favor of removal. *Grable*, 545 U.S. at 318. And there is no private right of action for damages arising from a violation of the SDWA or the LCR. *Harding-Wright v. D.C. Water & Sewer Auth.*, 350 F. Supp. 2d 102, 106–07 (D.D.C. 2005) (explaining that, although private parties may bring lawsuits against

violators of the SDWA under 42 U.S.C. § 300j-8(a)–(e), there is no private right of action for compensatory damages and, under *Merrell Dow*, there is no federal jurisdiction over state-law claims based on the SDWA).

In light of the aforementioned precedents, the MDEQ Defendants have not met their burden of demonstrating that federal jurisdiction exists.  We therefore conclude that removal under 28 U.S.C. § 1441 is inappropriate in the present case.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting. The analysis of the majority opinion is facially appealing, but it comes to the wrong result. The difference between our two views stems from our different starting points. The majority relies on a general rule favoring resolution of doubts against removal. But in *this* context, our precedents require us to resolve doubts in favor of the party or parties invoking federal jurisdiction. Instead of abiding by these precedents, my colleagues have embarked on a more searching (and speculative) inquiry than is warranted or permitted at this stage of the case. I respectfully dissent.[1]

**I**

We all agree that the district court treated plaintiffs' motion to remand as a facial attack. A facial attack, like a motion to dismiss under Fed. R. Civ. P. 12(b)(6), tests the sufficiency of the pleadings—such as the notice of removal and the complaint—and well-pled fact allegations are accepted as true. *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 816–17 (6th Cir. 2017); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012); *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A factual attack, on the other hand, raises a factual controversy requiring the district court to weigh the conflicting evidence in determining whether jurisdiction exists. *Wayside*, 847 F.3d at 817. Where, as here, "the district court treated the challenge as a facial challenge and made no factual findings in reaching its decision, the appeal is treated the same way." *Id*.

So, the parties' allegations should be the focus of our inquiry. The district court, rather conspicuously, focused only on plaintiffs' allegations and found no basis for federal jurisdiction in their assertion of state-law tort claims. The majority opinion acknowledges that defendants' notice of removal has an important role to play, but describes its allegations only in summary fashion. Let's take a closer look.

———————————

[1]Like the majority, I focus on the first of the removing defendants' two asserted bases for removal, the federal officer removal statute.

In the notice of removal, the MDEQ defendants aver, with reference to plaintiffs' Count I claim for gross negligence and Count II claim for intentional misconduct, that their actions complained of were taken in the course and scope of their employment with the MDEQ in their monitoring and testing of Flint's drinking water under federal law, the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300f *et seq.*, and under oversight of a federal agency, the EPA. R. 1, Notice of Removal ¶¶ 6–7, Page ID 3–4. The notice of removal states "[t]his is not a garden variety state law tort action that merely references a federal law or statute." *Id.* at ¶ 43, Page ID 14. Rather, the MDEQ defendants assert that Plaintiffs' claims are "inextricably intertwined with the construction, interpretation and effect of the SDWA and the LCR [Lead and Copper Rule]." *Id.* at ¶ 41, Page ID 14. More specifically, for example, they allege:

> 29. The Removing Defendants are being sued for allegedly failing to adhere to federal law, due to their alleged lack of compliance with the SDWA and LCR's detailed monitoring, testing, sampling, and notification requirements in overseeing the Flint water system, as administered by Removing Defendants under the EPA's direction and control.

> * * * *

> 40. Plaintiffs' complaint both specifically and implicitly alleges that these removing Defendants (along with other individual Defendants consenting to this removal) had duties to Plaintiffs based on the federal SDWA and LCR standards, regulations, monitoring, and testing requirements that were purportedly not followed and give rise to Plaintiffs' various causes of action.

> 41. Plaintiffs' claims are inextricably intertwined with the construction, interpretation, and effect of the SDWA and the LCR. If these and other Defendants establish that these federal laws and regulations were not violated, Plaintiffs' claims against these Removing Defendants are defeated.

> 42. Plaintiffs' gross negligence claims depend on a question of federal law, primarily whether these Removing Defendants complied with the SDWA and LCR during their oversight of the Flint water system. There are no alternative theories supporting gross negligence that do not implicate the SDWA and/or LCR, as the Removing Defendants are being sued for carrying out the EPA's duty, as delegated to Removing Defendants, to ensure that public water systems such as Flint comply with the SDWA and LCR.

> * * * *

> 44. Whether these and other Defendants violated the SDWA and LCR is disputed. The EPA has admitted that the LCR is ambiguous and subject to different possible interpretations and constructions when applied to this particular situation. . . . .

45. There is substantial need for uniform interpretation of the SDWA and LCR as it applies to Flint, and the other 155,000 public water systems subject to the SDWA and LCR, that provide water to almost all Americans across the United States.

*Id.* at ¶¶ 29, 40–42, 44, 45, Page ID 10, 14, 15 (footnotes omitted).

In addition, the notice of removal devotes nearly five pages to spelling out the relationship between the MDEQ and the EPA in sharing responsibility for monitoring water quality and enforcing compliance with standards established in the SDWA and its regulations, like the LCR. *Id.* at 6–10, Page ID 6–10. The following paragraphs are illustrative:

18. The SDWA directs the EPA to promulgate national primary drinking water standards and to regulate public water systems. *See* 42 U.S.C. § 300f *et seq.*

19. Specifically, with respect to the regulation of lead and copper, the EPA, in 1991, promulgated national primary drinking water regulations ("NPDWRs") for controlling lead and copper in public drinking water. 56 Fed. Reg. 26460 (June 7, 1991). These regulations are known as the "Lead and Copper Rule" or "LCR" and are found at 40 C.F.R. §§ 141.80, *et seq.* . . . .

20. The EPA's LCR applies to public water systems such as the City of Flint. *See* 40 C.F.R. § 141.80(a). Generally speaking, it requires those water systems to monitor the levels of lead and copper at consumers' taps and, under a number of different circumstances, requires those systems to employ various treatment techniques such as corrosion control treatment, source water treatment, lead service line replacement, and public education. 40 C.F.R. §§ 141.80(b)–(h).

21. The SDWA authorizes the EPA to delegate primary enforcement responsibility for public drinking water systems to states where the EPA determines, *inter alia,* that the state: (1) has adopted drinking water regulations that are no less stringent than the primary drinking water regulations promulgated by the EPA; (2) has adopted and is implementing adequate procedures for the enforcement of such State regulations, including conducting such monitoring and making such inspection as required by the EPA; and (3) will keep such records and make such reports with respect to its activities as required by the EPA. *See* 42 U.S.C. § 300g-2; *see also* 40 C.F.R. §§ 142.10, 142.11.

22. The SDWA, however, reserves tremendous oversight authority to the EPA, including mandatory EPA intervention in the form of notifications, advice, technical assistance, and, failing timely and sufficient state action, enforceable orders and inspections to bring water systems into compliance with federal standards. *See* 42 U.S.C. § 300g-3; *see also* 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 142.19, 142.30, and 142.34.

\* \* \* \*

24. If the EPA determines that a state no longer meets its requirements, the EPA is required to initiate proceedings to withdraw primacy approval. *See* 40 C.F.R. §§ 142.17(a)(2). If the EPA believes a state has abused its discretion in making corrosion control or source water treatment determinations in a substantial number of cases, or in cases affecting a substantial population, *the EPA may issue an order establishing federal treatment requirements for a public water system. See* 40 C.F.R. § 142.19(a) (emphasis added).

\* \* \* \*

28. Furthermore, EPA's direction and control over the MDEQ's implementation of the SDWA and LCR is most clearly demonstrated by the EPA's January 21, 2016 emergency order, whereby the EPA began monitoring and testing the Flint water system and ordered the MDEQ to take specific actions related to Flint. **Exhibit J.**

R. 1, Notice of Removal ¶¶ 18–22, 24, 28, Page ID 6–10 (footnotes omitted).

The allegations of the notice of removal thus, on their face, aver that plaintiffs' "garden variety state law tort action" is premised on alleged violations of duties stemming from federal standards established by the SDWA and the LCR—standards the MDEQ defendants were charged with monitoring and enforcing by virtue of the EPA's delegation of authority to them.[2]

## II

The district court paid little heed to these allegations, and my colleagues, by essentially ignoring its decision, implicitly acknowledge that the district court's analysis is flawed. Moreover, the majority acknowledges that several of the allegations in the notice of removal facially support a finding that the MDEQ defendants "acted under" the oversight or direction of the EPA. For instance, the majority recognizes (a) that the EPA delegated primary SDWA

---

[2]In fact, the removing defendants' contention that plaintiffs' tort claims are "inextricably intertwined" with enforcement of these standards was, in effect, all but conceded by plaintiffs' counsel during oral arguments. Pressed to identify the source of the duty allegedly breached by the MDEQ defendants, under Michigan law, whether statutory or case law authority—independent of the SDWA and the LCR—plaintiffs' counsel defaulted. Counsel was simply unable to identify a state-law source of the duty owed by the MDEQ defendants to plaintiffs, the breach of which allegedly amounted to gross negligence.

Counsel's failure in this regard is not surprising; it's entirely consistent with plaintiffs' amended complaint, which includes several references to the federal LCR, but does not name a state-law source of the duty allegedly breached. This deficit in plaintiffs' position does not dictate that the removing defendants were acting as or under federal officers. By negative implication, however, it enhances the facial "color" in defendants' allegations that their complained-of actions were taken pursuant to federal authority.

enforcement authority to the MDEQ; (b) that the MDEQ receives funds from the EPA to perform the required monitoring and enforcement; (c) that the EPA would have to enforce the SDWA in Michigan if the MDEQ did not have primary enforcement authority; (d) that the MDEQ was required to submit reports to the EPA detailing compliance with the standards established by the SDWA and the LCR; (e) that during the course of the MDEQ's monitoring of the Flint water system, the MDEQ defendants received numerous communications and recommendations from the EPA, culminating in the EPA's January 2016 Emergency Administrative Order attached to the notice of removal; and (f) that the Emergency Order, by establishing the EPA's own monitoring of the Flint water system and ordering the MDEQ defendants to take myriad actions to assist the EPA, evidences the EPA's supervision and control.

Yet, rather than accepting these allegations at face value, as we are obliged to do in response to plaintiffs' facial attack, the majority opinion scrutinizes each point individually and explains why each, viewed in isolation, is insufficient to persuade that the removing defendants have carried their burden of establishing jurisdiction. To justify this approach, the majority observes that "removal statutes are to be strictly construed, and all doubts should be resolved against removal," citing *Harnden v. Jayco, Inc.*, 496 F.3d 579, 581 (6th Cir. 2007), and *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006). But in each of these cases, removal was based on the defendant's assertion that the plaintiff's *complaint* implicated either the requisite amount in controversy or a question of federal law that justified federal jurisdiction. It stands to reason that the court's facial examination of the "unadorned snapshot" of the plaintiff's complaint in each case would be accompanied by a "presumption" resolving doubts in favor of the plaintiff, the drafter of the pleading under examination. To carry its burden under those circumstances, the removing defendant was aptly required to overcome the presumption favoring the plaintiff's construction of its own pleading.

The federal officer removal officer statute, however, is a different animal. The fundamental basis for removal under this statute is the *status* of the defendant as a federal officer or one acting under a federal officer. This status would ordinarily be set forth in the defendant's notice of removal, not in the plaintiff's complaint. It is for this reason, ostensibly, that "doubts" arising under a facial attack on federal officer removal are to be resolved in favor of removal. In

the instant case, plaintiffs' facial attack on the jurisdictional allegations in the notice of removal is thus accompanied by a presumption in favor of the defendants' construction of their own pleading. It follows that the removing defendants' allegations are to be read in the light most favorable to them and any reasonable doubts should be resolved in their favor.

The federal officer removal statute permits removal of actions brought against "(1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act *under color of such office. . . .*" 28 U.S.C. § 1442(a)(1) (emphasis added).

"The federal officer removal statute is not narrow or limited." *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (internal quotation marks omitted). "At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 406–07. One of the primary purposes is "to have such defenses litigated in the federal courts." *Id.* at 407. "This policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Id.*

The statutory language highlighted above makes clear that removal is available to some persons who are not federal officials, i.e., persons who are under the direction or instruction or guidance or control of a federal superior and who assist or help carry out the superior's duties. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151–52 (2007). The MDEQ defendants contend they are such persons and their notice of removal is replete with detailed allegations tending to substantiate their position. Under the regulatory scheme established by the SDWA, as described in the notice of removal, the MDEQ defendants have stated facts which, if proved, could support a finding that they were, in their enforcement of water quality standards, acting under the guidance and oversight and, ultimately, direction of the EPA (i.e., after issuance of the Emergency Order).

These allegations are to be accepted as true for purposes of this facial assessment. *Wayside*, 847 F.3d at 816; *Gentek*, 491 F.3d at 330.[3] If the allegations make out a colorable

---

[3]Of course, if plaintiffs were not content to accept the allegations as true, they had the option of asserting a factual attack, but that's not how the district court treated their motion to remand.

basis for federal jurisdiction, then jurisdiction is deemed to exist. *Gentek*, 491 F.3d at 330. And to the extent the allegations are intertwined with fact questions going to the merits, it is not for the court to muse about what how the record might ultimately be developed. Rather, doubts are to be resolved in favor of removal. The court should ordinarily assume jurisdiction over the case and then address questions going the merits in due course—unless the alleged basis for jurisdiction is "clearly immaterial or insubstantial." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir. 1981)); *see also Carrier*, 673 F.3d at 443–44; *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 811 (3d Cir. 2016). The lengths to which the majority opinion goes to explain why defendants' allegations are colorable but not persuasive (including a survey of the history and purposes of the federal officer removal) belie any notion that defendants' allegations are "clearly immaterial or insubstantial." In my opinion, the majority's analysis embarks on an excursion far beyond the boundaries that circumscribe a proper examination of the sufficiency of the pleadings.

**III**

Because the MDEQ defendants' jurisdictional allegations are not clearly immaterial and insubstantial, any doubts as to whether defendants will be able to prove the alleged facts—i.e., doubts about what the evidence will ultimately show, and about the actual nature of the shared regulatory relationship of the EPA and the MDEQ defendants, and about the extent to which the defendants' actions were subject to the guidance or oversight of the EPA—are all to be resolved at this stage in defendants' favor. I express no opinion on the likelihood that defendants will be able to prevail on the merits of their defenses. In question here is simply whether they have set forth colorable grounds warranting a federal forum. I believe they have alleged facts that, if proved, would support findings that they acted under a federal officer, under color of federal law, and have a colorable federal defense. *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010). This is enough to withstand plaintiffs' facial attack and permit federal officer removal. Because the district court, like my colleagues, disregarded the boundaries governing plaintiffs' facial attack in reaching a different conclusion, I would reverse the order of remand.

Accordingly, I respectfully dissent.